George NELSON, Plaintiff and Respondent,

v.

Lawrence HAGEN, d. b. a. Hagen Construction Company, Defendant,

and

Tri-State Insurance Company of Tulsa, Oklahoma, Defendant and Appellant.

No. 8348.

Supreme Court of North Dakota.

Dec. 8, 1966.

McGee, Van Sickle, Hankla & Backes, Minot, for appellant.

Walter O. Burk, Williston, for respondent.

ERICKSTAD, Judge.

This is an appeal by the defendant Tri-State Insurance Company of Tulsa, Oklahoma, a foreign corporation, from a judgment of the District Court of Williams County entered on October 6, 1965, in favor of the plaintiff, George Nelson, against the defendants, Lawrence Hagen, d. b. a. Hagen Construction Company, and Tri-State, in the amount of $3,235.74. Trial de novo is demanded.

Mr. Nelson initiated this action against his employer, Mr. Hagen, and Tri-State, which was the bondsman on three North Dakota highway construction projects on which Mr. Hagen was a subcontractor. The dates of the contracts, the names of the prime contractors, and the locations of the projects are as follows:

On July 22, 1959, Struksnes Construction Company of Minot, North Dakota, and David & Rix of Bismarck, North Dakota, entered into a contract with the State of North Dakota for the construction and completion of certain federal aid projects on U. S. Highways 2 and 52 in Ward County.

On September 29, 1959, Coghlan Construction Company, Inc., of Minot, North Dakota, entered into a contract with the State of North Dakota, for construction and improvement in connection with a federal aid secondary highway project in Sheridan and Burleigh Counties.

On July 2, 1960, Arne Anderson & Company of Ada, Minnesota, entered into a contract with the State of North Dakota for construction and completion of a fed-

eral aid secondary project on State Highway 30 in Wells County.

Tri-State executed three separate contract bonds whereby it bound itself in connection with each of the three projects. We have before us a copy of the subcontractor's bond for the Ward and Wells Counties projects and a copy of the prime contractor's bond for the Sheridan and Burleigh Counties project.

The pertinent part of the prime contractor's bond executed in connection with the Sheridan and Burleigh Counties project obligated the bonding company, if the principal or any subcontractor failed, to "pay or cause to be paid all bills and claims against the Principal or any subcontractor on account of labor or services performed and all materials, equipment or supplies furnished, whether directly or indirectly arising out of the performance of said contract."

Mr. Nelson was employed by Mr. Hagen in 1959 as a mechanic in repairing Mr. Hagen's heavy-duty construction equipment. In October 1959 Mr. Hagen commenced work on the project near Denhoff in Sheridan County. The work continued for only three weeks, when it became necessary because of the freeze-up to shut down for the winter. When this happened, all but Mr. Nelson and a helper were laid off. After the shut-down the machines were taken to a hill northeast of Denhoff, where Mr. Nelson and his helper did repair work on them. Mr. Nelson's Exhibit 3 received in evidence indicates that between January 10 and April 9, 1960, he worked a total of 391½ hours at $2.25 per hour on "general overhaul before starting season." He testified that the general overhaul included, if necessary, the grinding of valves and the installation of rings, and in one instance involved installing a new crankshaft.

Some pertinent testimony concerning this work was as follows:

Q. Now, during the winter months, when you did this repair work down there, which testimony shows was on a hourly basis, will you tell the Court the nature of the repair work that you did there?

A. Well, I would say it was to go over all the equipment and replace anything, tires, spark plugs, injectors, anything you know. We started each thing up and operated it. Put rings in some outfits, bearings in some outfits and perhaps a gear or sprocket. It is impossible for me to remember, but it was just a general up-keeping of it.

Q. What did you do with reference to taking the heads off and removing carbon, for instance?

A. Oh, yes, I did all that, sure.

Q. In other words, your job was general tune-up for the season?

A. Tune-up for the season, to get the stuff in shape for operating.

Q. And that is the job you did during the winter months?

A. That's correct.

Q. In other words, you went over all the equipment and checked it out and whatever had to be done to tune it up for the season, was the work you did?

A. We ran into a little extra work, too, because somebody stole some tires and we had to replace them.

Mr. Nelson's claims for this period total $880.88.

On or about April 10, 1960, Mr. Hagen recommenced work on the Sheridan County project. Mr. Nelson then worked as a mechanic in keeping the equipment in operating condition. From April 10 through July 15, 1960, he worked on the Sheridan County project at a weekly wage of $150 and was paid that amount for each week except for the two-week period of April 10 through April 23, 1960.

Between July 15 and August 17, 1960, Mr. Nelson worked with Mr. Hagen on the Ward County project. He was paid $150 for each week's work on this project.

Between August 17 and October 29, 1960, Mr. Nelson worked on the project in Wells County. He was paid $150 each week on that project except for the last two weeks, for which he received no pay.

On February 8, 1960, Mr. Nelson made a personal loan to Mr. Hagen of $1,000. At the time this loan was made Mr. Hagen was not performing construction work on any of the projects bonded by Tri-State. Mr. Nelson does not know what Mr. Hagen used the money for, but he understood it was to be used in the business. He testified that he requested Mr. Hagen at the time he lent him the $1,000 to apply the first money paid to him as payment on the loan, and that Mr. Hagen said that he would do so.

It should be noted, however, that when Mr. Nelson wrote to the State Highway Department after the completion of the projects, setting forth his claim against Mr. Hagen, he included in his claim an item entitled "Cash advanced February 8, $1,000."

Mr. Nelson also claims the sum of $169.-60 for parts he purchased for Mr. Hagen's equipment between March 31, 1960, and September 30, 1960. These parts included various small items, such as spark plugs, gaskets, and fan belts, which he used in making the repairs necessary to keep the equipment going during the construction season.

The total of all claims is $2,650.48, which is the amount of the judgment, not including interest and costs, that the trial court awarded Mr. Nelson.

The first issue with which we are confronted is whether Mr. Nelson is entitled to the $880.88 for labor performed in general overhaul of Mr. Hagen's equipment between the shut-down in 1959 of the Sheridan County project and the starting of the construction season again with that project in 1960 under Tri-State's bond.

Our statute on contractors' bonds reads as follows:

48–01–01. Bonds from contractors for public improvements.—Every public officer or board authorized to enter into a contract for the erection, repair, or alteration of any public building or any other public improvement, except a municipal improvement made under special assessment statutes, before permitting any work to be done on such contract, shall take from the contractor a good and sufficient bond for an amount equal at least to the price stated in the contract, conditioned to be void if the contractor and all subcontractors shall fully perform all terms, conditions, and provisions of the contract *and shall pay all bills or claims on account of labor and materials, including supplies used for machinery and motor power equipment, performed, furnished, and used in and about the performance of said contract, including all demands of subcontractors.* Such bond shall stand as security for all such bills, claims, and demands until the same are fully paid, labor and materialmen to have preference as to payment. Said bond shall run to the state of North Dakota, but any person having a lawful claim against the contractor, or any subcontractor, as provided in this chapter, on account of labor, materials, or supplies, or for a breach of said contract, may sue in his own name on said bond with like effect as though it were payable to him. [Emphasis added.]

North Dakota Century Code.

In support of its contentions on appeal Tri-State refers us to a 1927 case in which a plaintiff sought to recover on a public contractor's bond for materials supplied by the plaintiff which were used in the construction of sheds and bunkhouses and of barns to shelter horses, in making and repairing dump boxes for hauling gravel, and in building structures, some of which

were placed upon skids so that they could be moved from place to place as the work progressed or as they might be required on some other job. In denying recovery under the bond this court said:

\* \* \* We are of the opinion that an obligation incurred for the purchase of machinery or tools or to provide accommodations for the men employed or to shelter the horses that may be used upon the work is merely incidental and not such a direct contribution as the bond is designed to cover. \* \* \*

Piper-Howe Lumber Co. v. Padgett, 55 N.D. 811, 215 N.W. 468, 470.

The bond in that case "was conditioned for faithful compliance with and performance of the contract, for the protection of the State and any person or persons performing any labor or services or furnishing material to be used against any loss, for the payment of the wages of laborers, and payment for any and all material for which payment under the terms of this contract is to be made by him (the contractor)."

The statute then in effect read as follows:

§ 6832. Bonds from contractors on public improvements. It shall be the duty of every public officer or board authorized to enter into a contract for the erection, repair, alteration or betterment of any public building or any other public improvements before entering into any such contract, to take from the contractor a good and sufficient bond for an amount at least equal to the price stated in the contract, conditioned to be void if the contractor and all subcontractors shall pay all bills and claims on account of labor or materials furnished in and about the performance of said contract, including all demands of subcontractors, said bond to stand as security for all such bills, claims and demands until the same are fully paid. The obligee in said bond shall be the state of North Dakota; but any person having any lawful claim against the contractor, or any subcontractor, on account of labor or materials, or both, furnished in and about the performance of said contract, may institute an action to recover the same in his own name upon said bond, in the same manner and with like effect as though the said bond were made payable to him.

Compiled Laws of North Dakota 1913.

It is to be noted that the only material difference relative to the issues of this case between the 1913 law and the present law is the provision in § 48–01–01 which permits recovery for supplies.

In *Piper-Howe* this court said that it had previously held that a contractor's bond did not obligate the bondsman for premiums owing to the Workmen's Compensation Fund.

However, under this contractor's bond (wherein Coghlan Construction Company, Inc., of Minot, North Dakota, was the principal) for the work in Sheridan and Burleigh Counties, the bonding company obligated itself to pay such premiums.

In *Piper-Howe* it was also stated that a contractor's bond does not cover obligations incurred for gasoline and oil used in motor vehicles employed in carrying on work of construction. We are inclined to believe, however, that under the amendment to the statute such items would be included under supplies.

When one considers the differences in the bond in *Piper-Howe* and the bond of the prime contractor in the Sheridan and Burleigh Counties project (in which the surety company is obligated to pay or cause to be paid all bills and claims against the principal or any subcontractor on account of labor or services performed and all materials, equipment, or supplies furnished, whether directly or indirectly arising out of the performance of said contract) and the changes in the statute, *Piper-Howe* is of very little value as a precedent in this case.

■ The provision in that bond making the surety company liable for such items, whether directly or indirectly arising out of the performance of the contract, places an obligation on the surety company to pay for labor and material, even though it is "merely incidental."

■ In light of the provision which obligates the surety company to pay all bills and claims on account of labor or services performed and all materials, equipment, or supplies furnished, whether directly or indirectly arising out of the performance of the contract, we are convinced that the charges of $2.25 per hour for the repair work done by Mr. Nelson in the interim between the fall of 1959 and the spring of 1960 come within the terms of that contractor's bond. We say this, fully cognizant of the often quoted rules laid down in the Minnesota case of Clifton v. Norden. In that case the court said:

* * * The law was not intended to permit a contractor to go onto a bonded job with a run-down outfit and have it rebuilt at the expense of his sureties. Public contracts require the contractors to furnish their own equipment. They imply that it shall come onto the job complete, ready for use, and without any obligation against the work arising from antecedent conditions. Moreover, they demand, expressly or by direct implication, that his equipment be maintained by the contractor in a workable condition to the end that the job may be done expeditiously and within the contract price. In consequence, no Legislature has enacted, unless it be that of West Virginia (see Hicks v. Randich [106 W.Va. 109,] 144 S.E. 887), and no court held, that the bondsmen shall be liable for the purchase price of contractors' equipment, unless perchance it is of a kind which is to be used only on the job in question and is wholly consumed thereon, or at least consumed to the extent that there is no residual use or value

except as salvage (Dennis v. Enke, 55 S.D. 15, 224 N.W. 925).

If a motortruck purchased for immediate use on a public contract will in the normal course of things serve on others as well, its cost is not within the coverage of the contractor's bond. So also if a truck break down on the job beyond possibility of repair or be completely wrecked and be replaced by a new one which will serve other jobs as well, the cost of the new machine is not within the bond. The same must be true of any part of a machine which, through use or casualty, must be replaced. If it is such that it will normally not only serve the job in hand but others as well, its cost is not covered. That conclusion must be adopted and adhered to, or else there is none which will serve as a guide in determining, as to tools and machinery and the cost of repairing the same, whether the contractor's sureties are liable.

Clifton v. Norden, 178 Minn. 288, 226 N.W. 940, 941, 67 A.L.R. 1227.

Even without the provision in the prime contractor's bond which obligated the bonding company in the event of the contractor's default to pay claims whether directly or indirectly arising out of the performance of the contract, we believe that the part of the claim for labor for the interim repairs which was for minor repairs comes within the situation described in the following quotation from *Clifton*:

The foregoing does not overlook a class of repair work, minor in cost but of constant presence and importance, which may be within the bond on the job where it is done, even though the contractor will have use of it on other work also. A contractor frequently maintains a repair shop for the maintenance of his own equipment or that of subcontractors. The employés therein may be protected by the bond, notwithstanding some of their work serves other jobs as well, simply because their employment

itself is "under, or for the purpose" of, the contract in hand. Such men may be hired and used "for the completion of the contract in accordance with its terms," and so, entirely apart from the mere circumstance that some of their work will contribute to succeeding contracts, they may be within the bond on the one under way at the time being.

Clifton v. Norden, supra, 226 N.W. at 941.

Although some of the interim repairs involved replacement of major parts, as the claim for labor performed during the shut-down was for the most part for repair or replacement of inexpensive minor parts which ordinarily wear out quickly and thus would normally be substantially consumed in projects of this sort, and as the prime contractor's bond obligated the bonding company in the event of the contractor's default to pay claims whether directly or indirectly arising out of the performance of the contract, we find that this claim was one which indirectly arose out of the performance of the contract, and that it is therefore recoverable under the provisions of the prime contractor's bond.

■ Tri-State apparently was not the surety on the prime contractors' bonds for the Wells County and Ward County projects. It is nevertheless obligated under the terms of separate subcontractor's bonds for the $169.60 claim for parts and the $600 claim for labor performed. This we believe to be so even though the subcontractor's bonds did not include the provision making the bonding company responsible for the claims indirectly arising out of the performance of the contract.

As the claim of $169.60 was for miscellaneous small and inexpensive parts used on the subcontractor's equipment and thus was for material substantially consumed in the performance of the contract, it is within the subcontractor's bond.

There are minor things about machinery which are short-lived and subject to frequent destruction and replacement. The underlying equity requires discrimination "between labor and materials consumed in the work or in connection therewith, and labor and materials made use of in furnishing the so-called contractor's plant, and available not only for this, but for other work. * * * It has, however, no necessary relation to repairs of an incidental and comparatively inexpensive character, made on the plant during the progress of the work, representing only * * * ordinary wear and tear" or its equivalent. * * *

Clifton v. Norden, supra, 226 N.W. at 942.

The $600 claim for the daily labor performed in minor repair of the subcontractor's equipment to keep it operating also comes within the terms of the subcontractor's bond and is therefore an obligation of the surety company.

* * * Many courts, while denying a recovery against the contractor's surety for repairs made upon his plant or machinery, which materially add thereto, so that most of the benefit of such repairs is available for other contracts, take the position that if the repair is only minor, inexpensive, and incidental, so that it is substantially exhausted in the performance of the contract, it is within the contractor's bond. * * *

43 Am.Jur. Public Works and Contracts § 186, at 928 (1942).

As the repairs made during the progress of the work were only minor, inexpensive, and incidental, so that they were substantially exhausted in the performance of the contract, they are within the subcontractor's bond.

■ We are convinced, however, that Tri-State is not obligated to repay the $1,000 loan.

■ A person does not by the mere act of loaning money to a public contractor for

the purpose of paying labor become subrogated to the rights of the laborer. See: Newport Trust Company v. Susi, 153 Me. 51, 134 A.2d 543.

In American Jurisprudence it is stated:

* * * [I]t is a well-established general rule that a claim for money loaned or advanced to a building or construction contractor is not within the coverage of the ordinary form of contractor's bond conditioned on the performance of the contract and the payment of all claims for labor and material, even though the borrowed money has been wholly applied to the payment of the cost of labor and material actually going into the construction project. If the money loaned has not been expended for labor or materials going into the project, there is even less reason for holding it to be within the coverage of the ordinary form of contractor's bond conditioned on the payment of labor and material claims.

* * * * * *

In many instances, one who has loaned money to a contractor which the latter used to pay for labor and material has sought to recover from the surety on the contractor's bond upon the theory of legal subrogation to the rights of those laborers and materialmen whose claims would have been within the coverage of the bond, but the claim of subrogation has been quite generally denied, on the theory that the lenders were mere volunteers, and, as such, were not entitled to the benefits of subrogation. Furthermore, the doctrine of conventional subrogation can hardly be invoked in such cases merely upon the basis of an agreement with the contractor that upon payment of the laborers or materialmen from such fund, the lender should be subrogated to all their rights against the contractor and the bond, where the laborers, materialmen, and surety have no knowledge of the agreement. * * *

17 Am.Jur.2d Contractors' Bonds §§ 72, 73, at 249–251 (1964).

See also: First National Bank of Chisholm v. O'Neil, 176 Minn. 258, 223 N.W. 298; Carr Hardware Co. v. Chicago Bonding & Surety Co., 190 Iowa 1320, 181 N.W. 680; Annot., 127 A.L.R. 992, 993 (1940).

The case is therefore remanded with instructions to the trial court to modify the judgment in accordance with this opinion.

TEIGEN, C. J., and STRUTZ, MURRAY and KNUDSON, JJ., concur.